THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN 256535)
Jeffrey Mikel, Esq. (SBN 350671)
5100 Campus Drive, Suite 200
Newport Beach, CA 92660
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
cameron@sehatlaw.com
j.mikel@sehatlaw.com

LAW OFFICES OF J.G. WINTER
Jeremy Winter, Esq (SBN 245631)
102 Natoma St.
Folsom, CA 95630
Tel: (844) 734-2626
Fax: (916) 313-3239
jeremy@jgwinterlaw.com

Attorneys for Plaintiffs, Kitana Tolosa, individually, and on behalf
of the Estate of Lope Tolosa, and Matilde Dasalla Quiogue, individually

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

Case No.:

KITANA TOLOSA, individually, and as personal representative of the Estate of LOPE TOLOSA; MATILDE DASALLA QUIOGUE, individually;

　　　　　Plaintiffs,

　　vs.

COUNTY OF SACRAMENTO, a government entity; MANUELITO ARUTA, individually; JAIME ZARAGOZA, individually; SANDEEP

**COMPLAINT FOR DAMAGES**

1. **Deliberate Indifference to a Substantial Risk of Harm to Health -14ᵗʰ Amendment of U.S. Constitution**
2. ***State- Created Danger*-14ᵗʰ Amend.**
3. ***Monell*-Failure to Train (42 U.S.C. §1983)**
4. ***Monell*- Unconstitutional Custom, Practice and Policy -42 U.S.C. §1983**
5. **14ᵀʰ Amendment-Interference With Parental Rights - 42 U.S.C. §**

KAUR, individually; TERRI KRUG, individually; DEPUTY LUCA, individually, DEPUTY NGUYEN, individually, DOES 1-10, inclusive,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**1983**
**6. Negligence –Wrongful Death (State)**
**7. Bane Act C.C. 52.1 Et Seq. (State)**
**8. Failure to Summon Medical Care (California Government Code § 845.6)**

**DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1.  Plaintiff, Kitana Tolosa, is the adult daughter of, and successor-in-interest to, Lope Tolosa, (hereinafter referred to as "DECEDENT" "Mr. Tolosa" or "TOLOSA"). Kitana Tolosa is acting individually and in the capacity of a personal representative of the estate of Mr. Tolosa.

2.  Plaintiff, Matilde Dasalla Quiogue, is the mother of the decedent Mr. Tolosa and is acting individually.

3.  Plaintiff, Kitana Tolosa, has concurrently filed her C.C.P. sect. 377 declaration attesting to successorship of the estate of Mr. Tolosa.

4.  Plaintiffs, on behalf of TOLOSA, an inmate at the Sacramento County Jail, also known as the Main Jail (hereinafter, "Main Jail") operated by the Sacramento County Sheriff's Office, bring this action against Sacramento County ("COUNTY"), DOE 1, a jail nurse at the Main Jail, Nurse Manuelito Aruta, (hereinafter, "Nurse ARUTA"), Nurse Jaime Zaragoza, ("Nurse Zaragoza" or "ZARAGOZA"), jail nurses DOES 1 through 3, jail deputies and supervisors DOES 4 through 8, and DOES 9 through 10 for monetary damages to redress for the TOLOSA's injuries and death resulting from Defendants' deliberate indifference to his constitutional rights and liberties. Plaintiffs bring this action under the Fourteenth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, for injuries and death suffered as a result of the Defendants' substantial and deliberate indifference to

TOLOSA's health and welfare while in their custody. Plaintiffs further bring their 14th Amendment Deliberate indifference claim under the recent 9th Circuit Court of Appeals decision in *Gordon v. County of Orange et* al. *888 F.3d 1118.* Plaintiffs state a claim against the Defendants for a failure to establish policies, procedures and training which resulted in the subject incident. This is a civil action seeking damages against the Defendants for committing acts under color of law, and depriving Decedent of rights secured by the Constitution and laws of the United States (42 U.S.C. § 1983). Defendants COUNTY, nurse ARUTA, Nurse ZARAGOZA, KRUG, KAUR, Deputies NGUYEN, LUCA, Deputy DOES 1 through 3, Correctional Nurses and medical staff DOES 4 through 8, and Sacramento County Jail management and employees including DOES 9 through 10, were deliberately indifferent by, without limiting other acts and behaviors: failing to provide medical care, failing to follow its established medical care and treatment protocol; failing to protect decedent from harm; failing to provide necessary and appropriate medical treatment and, failing to provide necessary and appropriate personnel needed for the health and welfare of Decedent, who at the time of death, was a pretrial detainee at the Sacramento County Jail, in Sacramento County, California. Defendants deprived the Decedent's rights as guaranteed by the Fourteenth Amendments to the Constitution of the United States against cruel and unusual punishment.

5. The Defendants, and the Sacramento County Jail medical officials, management and employees violated the decedent's constitutional rights and were deliberately indifferent by, without limiting other acts and behaviors: (1) deliberately ignoring and failing to heed to TOLOSA's serious medical condition, to wit, TOLOSA's numerous complaints of shortness of breath, abdominal pain and pleas for help including obvious symptoms of physical distress when he was curled up in a fetal position, suffering from internal bleeding, rapid heartbeat, physical pain and withdrawal symptoms; (2) ignoring TOLOSA's worsening

physical condition when he repeatedly pushed the emergency button in his cell to the point when he had to call man-down on himself; (3) failing to properly respond to obvious signs that TOLOSA was in need of urgent hospitalization; (4) failing to administer an automated external defibrillator; (5) Failing to have TOLOSA evaluated by a medical provider (7) Failing to administer CIWA assessments (8) Failing to conduct proper welfare checks including direct-view safety checks and to report TOLOSA's obvious medical distress to medical staff (9) Failure to hospitalize TOLOSA prior to TOLOSA resorting to calling man-down on himself; (10) Falsifying DECEDENT's medical charts to deceptively claim he knowingly refused medical care and CIWA assessments in violation of California Criminal Penal Code §471.5 and of ACH policy. (11) Nurse DOE 1's failure to attend to TOLOSA's medical emergency when first reported to her by Deputy LUCA (12) failure to hospitalize and refer to a higher level of care (13) COUNTY's failure to maintain a sufficient number of medical staff to monitor and treat inmates undergoing detoxification (13) COUNTY's failure to provide training to its jail deputies (14) COUNTY's failure to train medical staff in proper medical screening, CIWA assessment and refusal documentation, emergency response and proper Title 15 welfare checks.

6. Because of the defendants' actions and inactions, TOLOSA suffered debilitating physical and emotional pain and injuries for duration of hours before he collapsed and suffered from intestinal volvulus[1] which is fatal if untreated.

## JURISDICTION AND VENUE

7. This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Eighth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, to redress injuries and

---

[1] Volvulus occurs when a loop of intestine twists around itself and the mesentery that supplies blood to the intestine, causing a bowel obstruction. Symptoms include, fatigue, dizziness, loss of appetite, abdominal swelling, vomiting, constipation, bloody stool, rapid heart rate, shortness of breath, rapid breathing, severe abdominal pain, fever, chills, infection, bowel perforation, loss of blood and eventual death.

the death suffered by the plaintiff's TOLOSA at the hands of defendants.

8.   Kitana Tolosa submitted a government Tort claim form on November 5, 2024, which was rejected on October 8th, 2024, by the County of Sacramento pursuant to Government Code §911.2, through its Clerk of the Board of Supervisors. The claim stated the time, place, cause, nature and extent of the Plaintiffs' and Decedent's injuries.

9.   This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

10.   At all relevant times, the Decedent was an inmate at the Sacramento County Jail operated by the Sacramento County Sheriff's Department.

11.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

12.   At all times relevant to this complaint, Plaintiff, Kitana Tolosa is the daughter and successor-in-interest to DECEDENT, and is an individual residing in California. She brings her claims both on behalf of her father's estate and individually.

13.   At all times relevant to this complaint, Plaintiff Matilde Dasalla Quiogue, is the mother of the DECEDENT, who is an individual residing in California, and is suing in her own individual capacity.

14.   At all times relevant to this complaint, DECEDENT was a non-convicted inmate, also known as a pretrial detainee, who was housed at the Sacramento County Jail, California, where he died.

15.    Defendant Sacramento County, hereinafter known as "COUNTY", is a governmental entity that acts through individuals to establish its policies and that is capable of being sued under federal law.

16. *Reserved*

17.  The Sacramento County Sheriff's Department is a subsidiary of COUNTY

Defendant and is responsible for supervising and operating the Sacramento County Main Jail, a correctional division, and ensuring the health and safety of all inmates and pretrial detainees incarcerated in its corrections facilities.

18.  Defendant Deputy Nugyen, hereinafter referred to as Deputy "NGUYEN" is an employee  (ID #154) of the COUNTY of Sacramento, and at all times relevant was a deputy assigned to the Main Jail, located in Sacramento County; he was at all times relevant to the Complaint employed as a control booth deputy assigned to TOLOSA's detox housing unit at the "100 pod on 6 East". The detox housing unit houses inmates detoxifying from substances and alcohol and who require closer monitoring than general population inmates.  Defendant NGUYEN is a duly authorized employee and agent of the Sacramento County Sheriff's Office and was acting within the course and scope of her perspective duties as deputy in the Sacramento County Jail with the complete authority and ratification of his principal, Sacramento County.  Defendant NGUYEN is being sued in his individual capacity.

19.  Defendant Deputy Luca (ID #880), hereinafter referred to as Deputy "LUCA" is an employee of the COUNTY of Sacramento, and at all times relevant was assigned as a "floor" deputy at the Main Jail, located in Sacramento County; he was at all times relevant assigned to TOLOSA's detox housing unit at the "100 pod on 6 East". Defendant LUCA is a duly authorized employee and agent of the Sacramento County Sheriff's Office and was acting within the course and scope of his perspective duties as deputy in the Sacramento County Jail with the complete authority and ratification of his principal, Sacramento County.  Defendant LUCA is being sued in his individual capacity.

20.  Defendant Manuelito Aruta, was, hereinafter referred to as "ARUTA" or "Nurse ARUTA", is an employee of the Sacramento County Adult Correctional Healthcare, located in Sacramento County, and at times relevant to the complaint was employed in the capacity of a jail nurse. Defendant ARUTA is a duly

authorized employee and agent of the Sacramento County Adult Correction Healthcare and was acting within the course and scope of his perspective duties as a registered nurse within the Main jail with the complete authority and ratification of his principal, Sacramento County. Defendant ARUTA is being sued in his individual capacity.

21.   Defendant Jaime Zaragoza, was, hereinafter referred to as "ZARAGOZA" or "Nurse ZARAGOZA," is an employee of the Sacramento County Adult Correction Healthcare, located in Sacramento County, and at times relevant to the complaint was employed in the capacity of a jail nurse. Defendant ZARAGOZA is a duly authorized employee and agent of the Sacramento County Adult Correction Healthcare, and was acting within the course and scope of his perspective duties as a registered nurse within the Main jail with the complete authority and ratification of his principal, Sacramento County. Defendant ZARAGOZA is being sued in his individual capacity.

22.  Defendant Teri Krug, was, hereinafter referred to as "KRUG" or "Nurse KRUG," is an employee of the Sacramento County Adult Correction Healthcare, located in Sacramento County, and at times relevant to the complaint was employed in the capacity of a jail nurse. Defendant KRUG is a duly authorized employee and agent of the Sacramento County Adult Correction Healthcare, and was acting within the course and scope of his perspective duties as a registered nurse within the Main jail with the complete authority and ratification of his principal, Sacramento County. Defendant KRUG is being sued in his individual capacity.

23.      Defendant Sandeep Kaur, was, hereinafter referred to as "KAUR" or "Nurse KAUR," is an employee of the Sacramento County Adult Correction Healthcare, located in Sacramento County, and at times relevant to the complaint was employed in the capacity of a jail nurse. Defendant KAUR is a duly authorized employee and agent of the Sacramento County Adult Correction

Healthcare, and was acting within the course and scope of his perspective duties as a registered nurse within the Main jail with the complete authority and ratification of his principal, Sacramento County.  Defendant KRUG is being sued in his individual capacity.

24.    Defendant Deputy Luca, was, hereinafter referred to as "LUCA", is an employee of the Sacramento County Jail, located in Sacramento County, and at times relevant to the complaint was employed in the capacity of a jail deputy. Defendant LUCA is a duly authorized employee and agent of the Sacramento County Sheriff's Office and was acting within the course and scope of his perspective duties as inmate staff in the Sacramento County Jail with the complete authority and ratification of his principal, Sacramento County.  Defendant LUCA is being sued in his individual capacity.

25.    Defendants, hereinafter referred to as "DOE 1", is an employee of the Sacramento County Jail, a subsidiary of Defendant Sacramento County, and at times relevant to the complaint was employed in their capacity as a jail nurse. Defendant is a duly authorized employee and agent of Sacramento County Adult Correctional Healthcare and was acting within the course and scope of her perspective duties as detox nurse in the in "5 East" section of the Main Jail, with the complete authority and ratification of their principal, Sacramento County. Defendants DOES 1 is being sued in her individual capacity.

26.    Defendants, hereinafter referred to as DOES 4-8, are employees in their capacity as jailers at the Sacramento County Jail, a subsidiary of Defendant Sacramento County, and at times relevant to the complaint was employed in the capacity of a jail deputies and correctional staff. Defendants are duly authorized employees and agent of Sacramento County Jail and were acting within the course and scope of her perspective duties as inmate jail staff in the Sacramento County Jail with the complete authority and ratification of their principal, Sacramento County. Defendants DOES 4-8 are being sued in their individual capacity.

27.    Defendants, hereinafter referred to as "DOES 2-3", are employees of COUNTY and working as medical staff for the Adult Correction Healthcare, and at times relevant to the complaint were employed in the capacity of correctional nurses and medical staff at the Sacramento County Jail. Defendants "DOES 2-3 are a duly authorized employees and agents of Sacramento County and was acting within the course and scope of their perspective duties as a medical staff in the Sacramento County Jail with the complete authority and ratification of their principal, COUNTY. Defendants are being sued in their individual capacities.

28.    DOES 9 through 10 are employees of defendant Sacramento County, and at all times relevant to the complaint were employed in the capacity of supervisory staff at the Sacramento County Jail. They are duly authorized employees and agents of Sacramento County and were acting within the course and scope of their perspective duties as staff in the Sacramento County Jail with the complete authority and ratification of their principal, Defendant Sacramento County. DOES 9 through 10 are sued in their individual and official capacities.

29.    At all times mentioned herein, each and every defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

**MAYS v. COUNTY OF SACRAMENTO-MEDICAL CONSENT DECREE**

30.    On July 31, 2018, inmates who were incarcerated at the Sacramento County Jails filed a class action complaint alleging amongst other things that Defendant County of Sacramento failed to provide minimally adequate medical and mental health care to the people incarcerated in its jails, imposed on the people in the jails the harmful and excessive use of solitary and discriminated against individuals with disabilities in violation of the Americans with Disability Act. On December 27, 2018, the Court granted the parties' joint motion for class certification.

31. On June 20, 2019, a proposed Consent Decree was issued where through the active monitoring and agreed upon subject matter experts to evaluate the policies, procedures and practices and condition of the jails and to complete regular reports. A remedial plan was agreed upon and was designed to meet the minimum level of mental and medical health care necessary to fulfill Defendants' obligations under the 8th and 14th Amendment to avoid the unlawful use of segregated or restrict housing amongst other matters.

32. Specifically, the consent decree required COUNTY to develop and implement detoxification protocols for assessment, treatment, and medication intervention for alcohol, opiate, and benzodiazepine withdrawal that are consistent with community standards. The protocols shall include the requirements that 1) Nursing assessment of people experiencing detoxification shall be done at least *two times a day for five days and reviewed by a physician 2) nursing assessment shall including both physical findings, including a full set of vital signs, as well as psychiatric findings  3) Medication interventions to treat withdrawal symptoms 4) The county shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy and 5) Patients experiencing severe, life-threatening intoxication (an overdose) or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.*

33.   Per the consent decree, COUNTY was also required to implement Nursing Protocols to address the varying degrees of acuity of condition from low, medium to high. To that end, COUNTY shall revise its Standardized Nursing Protocols to include assessment protocols that are sorted, based on symptoms, into low, medium and high-risk categories as follows:

> (a) Low-risk protocols would allow RN's to manage straightforward symptoms with over-the -counter medications;

(b) Medium-risk protocols would require a consultation with a provider prior to treatment; and

(c) High-risk protocols would facilitate emergency stabilization while awaiting transfer to higher level of care.

34.    According to ACH's policy on patient "refusals" of medical care and as delineating by "County's January 16th, 2024, Eight Status Report", when an inmate refuses a medical evaluation, such a refusal shall ***not*** indicate a waiver of subsequent healthcare. *Upon a refusal, medical staff will follow-up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the inmate to refuse a service. Further, any such refusal will be documented by medical staff and must including 1. A description of the nature of the services being refused, 2. Confirmation that the patient was made aware of and understands any adverse health consequences by medical staff and 3. The signature of the patient and 4. The signature of the medical staff. In the event the signature of the patient is not possible, the staff will document the circumstances.*

35.   The consent decree further addressed the medical staff deficiencies requiring the county to maintain sufficient staffing to meet professional standards of care and to execute the requirement of the Remedial Plan, including clinical staff, office and custody staff for escort and transportation.

36. With regards to the medical intake and screening, COUNTY was required to follow a triage process in which intake nurses schedule patients for follow up appointments based on their medical needs and acuity at intake, and ***shall not rely solely on patients to submit Health Services Request***, establish clear protocols that include ***appropriate intervals of care*** based on clinical guidelines, and that intake nurses shall schedule follow up appointments at the time of intake based on those protocols.

37. With regards to training, the Consent decree required COUNTY to ensure that <u>all jail custody staff</u> receive formal training in medical needs, which shall encompass medical treatment, critical incident responses, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices. Training shall be received at a minimum every two years.

38. *Reserved*

## **FACTUAL ALLEGATIONS**

39.    DECEDENT Lope Edwin Tolosa was arrested and booked into the Sacramento County Jail on May 3ʳᵈ, 2024, and remained there until his death seventy (70) hours later.

40.  On **May 3ʳᵈ** approximately <u>12:30 a.m.</u>, TOLOSA was medically evaluated by Nurse Danielle Flores who noted that he was at risk for alcohol withdrawal as he had drank " 20+ days of last 30 days" and that scored a PAWSS score of "1"). His blood pressure was noted as 153/95, pulse: 90, and oxygen saturation at 98. She noted a slurred speech and the following "verbal" orders presumably from a provider or a senior RN although she also checks a box which indicate that "no provider" gave her any orders.  She notes TOLOSA required to be seen by a doctor in an "MD Sick" call follow-up and a provider initial' "H&P" (history and physical examination) to be taken which one can reasonably infer that she took it upon herself to fill in the initial "provider" orders with a follow up by one to confirm and authorize the order. However, TOLOSA was never seen by any providers nor a doctor during the nearly three days he was incarcerated.

41. Pursuant the "verbal orders", Nurse Flores' chart also indicates that TOLOSA was to be placed in a "Detox Housing" with CIWA[2] assessment every "4-6 hour" and a lower bunk assignment.

---

[2] CIWA is a standardized "Clinical Alcohol Withdrawal Assessment" scale which scored the severity of various symptoms such as heartrate, nausea, vomiting, tremors, sweating, anxiety, agitation, tactile disturbances, auditory disturbances, visual disturbances, headaches.

42. According to the CIWA order, TOLOSA was to be assessed for alcohol withdrawals at a minimum of four (4) times per every 24-hour period for a minimum of twelve (12) total assessments during the three days he was in jail before his death. However, contrary to orders, defendant nurses failed to assess him anywhere close to the required frequency but rather assessed him only once during the seventy (70) hours before he passed away, and claimed TOLOSA refused four "attempted" CIWAs.

43. According to Sacramento County Jail Standardized Nursing Policies, CIWAs are to be conducted every 4 hours or every 2 hours if the nurse is unable to complete the CIWA monitoring assessment.

44. On **May 3rd** at approximately 10:17 a.m., Nurse Sherchan, indicates that he could not locate TOLOSA in his housing location and fails to administer a CIWA claiming he "is probably still in booking/property. No attempt was made to locate him.

45. On **May 3rd** at approximately 2:45 p.m., Nurse Sherchan, performs the one and only CIWA, but not until 12 hours after the orders were initially issued. She notes patient "agreed to assessment, BP 158/94, HR 84, O2: 98 and a score of "O"- She also recommend to continue the "existing monitoring schedule".

46. On **May 3rd** at approximately 10:38 p.m., about 10 hours after the last CIWA, Defendant ARUTAS notes the first claimed refusal for a CIWA indicating TOLOSA "refused to come out" and responds to his questions as to whether he had any symptoms: "No symptoms". There is no documented refusal form as required per policy. Nor is there documentation that ARUTAS went inside the cell or even looked for any visible signs of alcohol withdrawal such as sweating, tremors, agitation, nausea, vomiting and disorientation.

47. On **May 4th** at approximately 10:27 a.m., Nurse Turapan attempts a CIWA on TOLOSA however, she too claims he refused stating that "patient refused to come out and be assessed, and officer asked him twice, but he wouldn't

come out". However, Nurse Turapan failed to personally observe TOLOSA or enter the cell to see for herself whether TOLOSA actually refused instead of relying on a deputy's word that he "refused to come out."

48.    On **May 4th**, sometime <u>between 10:27 a.m. and midnight</u>[3], Defendant ARUTAS purportedly tried to perform another CIWA based on his charting note, and claims TOLOSA yet again refused the CIWA.

49.    ARUTAS' credibility is highly questionable because his attempted 5/4 CIWA Soap notes was not created until *after* TOLOSA' death[4] or on 12:07 a.m. on May 6th, just two hours after his death, and was followed by a second Soap note about the same purported CIWA refusal just 30 minutes later or at 12:37 a.m., suspiciously adding more information in typical "CYA" fashion.  This raises serious doubt that TOLOSA was even seen much less knowingly "refused" any CIWA assessment by ARUTAS on May 4th. No vital signs were taken of him on that day.

50.    On **May 5th** at approximately <u>10:03 a.m.</u>, Nurse ZARAGOZA, purportedly sees TOLOSA in his cell, but notes yet again a 4th refusal claiming that "he walked over and signed a hard copy form". ZARAGOZA' charting note is not timestamped until "7:37 p.m." in the evening, but states he refused vital signs, a CIWA, that he stated "I'm alright" and that ZARAGOZA did not observe any "symptoms of Detox" just two hours before TOLOSA's man-down incident takes place. This is the only "refusal form"  of the 4 claimed refusals, yet TOLOSA's signature is questionable as it does not appear to match his signature on earlier documented consent forms.  Neither did ZARAGOZA document any of the objectively identifiable signs of alcohol withdrawals.

51. On **May 5th** Deputy NGUYEN (ID# 154), started his shift at 6:30 p.m. as

---

[3] Arutas' chart has no time-stamp other than a "May 4th " date.

[4] Nursing Soap charting policy requires contemporaneous entries or to be created very close in time to when a patient is seen unless there is substantial justification for the delay. Here Nurse Arutas' notes on 5/6 at 12:07 a.m. and 12:37 a.m., several hours after his death, were authored <u>24-30</u> hours after the claimed 5/4 Ciwa refusal took place.

an assigned control deputy on 6 East, the same Detox housing where TOLOSA was located. Upon information and belief, Deputy NGUYEN was in charge of monitoring the detox cells both via intercom and video surveillance feed.

52.  On **May 5th** Deputy LUCA (ID# 880), was assigned a floor deputy on 6 East, the same Detox housing where TOLOSA was located. Upon information and belief, Deputy LUCA was in charge of conducted welfare checks, monitoring the detox cells both via intercom and video surveillance feed, and reporting inmates in medical distress to nursing staff.

53.  On **May 5th** at approximately 9:45 p.m., according NGUYEN's report, TOLOSA uses his cell intercom to call for his own man-down stating he "*couldn't breathe*". Instead of personally attending to TOLOSA's emergency or requesting another deputy to check up on him, NGUYEN informs TOLOSA that he will notify a jail nurse to check up on him. Interestingly, Defendant LUCA within his own narrative report downplays the same emergent man-down request as TOLOSA "advising the deputies that he had *physical concerns for his well-being.*"

54.  At approximately 9:55 p.m., Nurses KRUG and KAUR arrive at TOLOSA's cell, lying on his right side and unresponsive, with spittle and mucus noticeably running from his mouth. Nurse KRUG makes contradictory observations namely that TOLOSA's *skin was cool to the touch, no observable chest movement, his pupils fixed and dilated* all consistent with the after effects of death, yet concurrently notes he had a weak apical pulse, a heart rate of "132" and a blood pressure of "112/72".  Defendants also brought an Automatic External Defibrillator (AED), yet there is no indication that it was ever used on him.  Based on at least *some* of his vital signs, if in fact true, the AED would have increased TOLOSA's chance of survival.

55.  Per KRUG's charting notes, CPR was started at 9:56 p.m., which again is contradictory to TOLOSA having a pulse of "132" because starting chest

compression on someone who has a heart rhythm is harmful and can cause serious injuries. His mouth and back of throat were suctioned off mucus and secretions. EMS arrived at "2207" but all continued CPR efforts were futile as TOLOSA' pulse was never regained, and was pronounced deceased at 10:19 p.m.

56.    Upon information and belief, TOLOSA's cell was under video monitoring which Deputy NUGYEN and LUCA were responsible for. Considering the gradual worsening of TOLOSA's symptoms, and based on witness and Defendants' own observations of TOLOSA, he had been lying in a fetal position on the cell floor, in noticeable distress for several hours and in agonizing pain prior to calling his own man-down and.

57.    Deputies NGUYEN and LUCA's inaction in response to TOLOSA's obvious medical distress was inexcusable.   Even when detoxifying inmates are observed routinely sleep on the cell floor, there is an obligation to discern severe signs and complaints of medical distress from common symptoms of substance withdrawals. Those obligations are contained under Title 15 and require the deputy to check for signs of life and distress which includes observing the face for breathing, observing the chest rising and lowering, observing for skin coloration or anything else that would visibly indicate that the inmate is in medical distress. If the above observations cannot be made, a guard has to physically walk up to the inmate and check for signs of life.  The reason for the required due diligence is that inmates, unlike civilians, do not have the liberty to summon 911 or emergency care but are strictly reliant upon those in charge of their custody to do so.

58.    A medical examination performed by Dr. Peter Conner, the County Medical Examiner, revealed that TOLOSA died due to a hemorrhagic intestinal Volvulus with 400 ml of blood hemorrhaged into his abdominal cavity

59.    Signs and symptoms of an intestinal volvulus include fatigue, weakness, shortness of breath, rapid heartbeat, infection, fever, chills, nausea, vomiting,

abdominal tenderness and swelling, along with ***excruciating[5] and unrelenting abdominal pain,*** all of which would have been obvious to Deputies NGUYEN and LUCA who were responsible for monitoring TOLOSA's detox housing, a housing unit which required a higher level of monitoring than the rest of the population.

60.    DECEDENT, while in the Sacramento County Jail, had merely been charged with a crime and had not been convicted of anything. Accordingly, he was a pre-trial detainee and thus guaranteed the right to constitutionally adequate medical care, medical screening and to direct-view safety checks sufficient to determine the need for medical treatment pursuant to recent 9th Circuit Appellate decisions in <u>Gordon, Mary v. County of Orange</u> et al. *888 F.3d 1118 (2018) (Gordon I) and Gordon, Mary v. County of Orange et al, 6F.4th 961 ( July 26, 2001) (Gordon II).*

61.    From the time of DECEDENT'S booking on May 3, 2024, until his death on May 5, 2024, DECEDENT's physical condition deteriorated as Defendants observed yet failed to act in a detox housing where inmates are supposed to be closely monitored.

62.    As Defendants knew DECEDENT's condition was worsening, he continued to be ignored and rather, treated as another inmate going through mild substance withdrawals.

63.    TOLOSA was forty-five years old at the time of his demise.

## FIRST CLAIM FOR RELIEF

### Deliberate Indifference to a Substantial Risk of Harm
### to Health -14th Amendment of the U.S. Constitution,

---

[5] According to Dr. Vassalo, an emergency medicine doctor hired as an expert to conduct medical review of the Sacramento County jail medical procedures and several in-custody deaths that took place during a monitoring period subject to the Mays v. Sacramento County Consent decree, she specifically opined that TOLOSA would have been in "agonizing pain" prior to his death.

**against Defendants NGUYEN, LUCA, KRUG, ZARAGOZA, KAUR, ARUTA, DOE 1, DOES 2-3, DOES 4-8, and DOES 9-10**

64.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 63 of this Complaint with the same force and effect as if fully set forth herein.

65.    From the time TOLOSA was booked into the Sacramento County Jail until the time of his death, the Defendants repeatedly denied TOLOSA proper medical care in repeated violation of his 14th Amendment constitutional rights.

66.    All Defendants were informed that TOLOSA was in severe medical distress, was noticeably decompensated and required prompt hospitalization. TOLOSA's health problems were complicated by the fact that he suffered from alcohol withdrawal, but many of his intestinal volvulus symptoms were similar to alcohol withdrawal and would have been noticeable to any correctional and medical staff.  TOLOSA's day long suffering and ultimate death was preventable had he been evaluated and promptly hospitalized.

67.    All of the Defendants knew there was a substantial risk to TOLOSA's health if his medical emergency including symptoms of his severe abdominal complaints and alcohol withdrawal went untreated, but repeatedly denied him constitutionally adequate medical treatment, failed to frequently monitor him, and to add insult to injury falsified his charts to claim he refused CIWA assessments and medical care, when he was in a physical distress, incapable of knowingly refusing life-saving treatment.

68.    Despite obvious visible signs of physical distress, including excruciating complaints of abdominal pain, Deputies NGUYEN, LUCA, and DOES 4-8 failed to observe and closely monitor TOLOSA's emergent medical condition caused by his intestinal twisting, and his worsening physical condition, and to report the same as mandated by Title 15 and the jail's policy of correctional deputies. Instead, Deputies NGUYEN and LUCA mischaracterized TOLOSA's severe

symptoms as trivial and routinely displayed by inmates detoxifying from substances. Deputies NGUYEN, LUCA, and DOES 4-8 failed to report TOLOSA's symptoms so he can be timely hospitalized. Instead, TOLOSA was left in his cell curled up into a fetal position and to his own devices.

69.    Apparently, at the time of the incident, the standard of medical care at the Main Jail was to wait until an inmate drops dead, a man-down to be called, then to initiate medical care in the form of emergency Cardio Pulmonary Resuscitation.

70.    Deputies NGUYEN, LUCA, and DOES 4-8 failed to call for an evaluation by medical staff after TOLOSA was noted in distress for a significant period of time prior to his man-down call.

71.    Deputies NGUYEN, LUCA, DOES 4-8 failed to report TOLOSA's need for acute medical attention when they observed an ailing TOLOSA, lying on the cell floor, in agonizing pain and foaming from the mouth.

72.    Despite determining that TOLOSA needed to be evaluated for CIWAs every 4-6 hours, he was only given <u>one</u> CIWA assessment during the 70 hours before he died and falsely claimed that he refused four (4) attempted CIWAs, several of those charted *posthumously*. This falsification of the medical charts is a violation of both ACH nursing and medical policies and a violation of California Penal Code §471.5[6] (a)

73.    Defendants ZARAGOZA and ARUTA failed to conduct TOLOSA's prescribed CIWAs and rather falsified the charting notes to claim he refused his CIWA assessments. Even when noting the refusal, knowing that no vital signs were taken defendants ZARAGOZA and ARUTA failed to put TOLOSA under continued observation to closely monitor his condition.

74.    Defendants NGUYEN, LUCA and DOES 4-8 failed to hospitalize TOLOSA when he was showing signs of a worsening medical and condition.

---

[6] PC 471.5(a) states that any person who alters or modified the medical records of any person, with fraudulent intent, or **who, with fraudulent intent, creates any false medical record, is guilty of a Misdemeanor.**

75.    Defendants Nurse DOE 1 failed to attend to TOLOSA's man-down call and instead nonchalantly referred the Deputy to summon another nurse to attend to TOLOSA's emergency.

76.    Defendants KRUG and KAUR failed to accurately document TOLOSA's man-down vital signs and conditions questioning whether TOLOSA was dead or not when they responded, and failed to utilize an AED machine which would have increased TOLOSA's chances of survival because at least given some of the noted vital signs, he had a heart rate which is when the AED is most effective.

77.    As a result of the repeated denial of constitutionally adequate medical care, DECEDENT spent his time at the Sacramento County Jail suffering unnecessary and excruciating pain.

78.    The Defendants, acted with deliberate indifference to a serious health condition and to the urgent medical needs of TOLOSA by ignoring him and failing to provide him with proper medical attention and/or to hospitalize him.

79.    As TOLOSA was deemed to be a pretrial detainee, the Defendants' acts of deliberate indifference in failing to provide medical care to treat the TOLOSA serious medical conditions, constitutes cruel and unusual punishment in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution.

80.    All Defendants were deliberately indifferent to the serious medical needs of TOLOSA. It should be adequately clear that any reasonable corrections deputies, jail staff, and/or medical practitioner would comprehend that by denying medical care, TOLOSA was exposed to undue suffering or threat of tangible residual injury, which, in the end, proved to be fatal. The Defendants intentionally denied TOLOSA proper medical care by failing to monitor him, to report him and to treat him, to hospitalize him or transfer TOLOSA for proper care, causing him to unduly suffer for the time he was incarcerated.

81.   Had the Defendants and their employees, agents, and servants, not acted with deliberate indifference to the obvious and serious health needs of TOLOSA, and provided prompt medical attention, he would not have died.

82.   TOLOSA'S death was preventable.

83.   Such acts and omissions of the Defendants violated TOLOSA'S constitutional rights guaranteed under 42 U.S.C. § 1983, and the Fourteenth Amendments to the United States Constitution. The defendants knew that failing to treat TOLOSAs worsening medical problems would lead to a fatality, but not before TOLOSA endured significant pain and agony during the period preceding his death.

84.   Defendants including DOES 1-10, were both directly liable for the wrongdoing and/or inaction with regards to DECEDENT's care because they were integral participants in the failure to provide medical care and to closely monitor him, or because they failed to intervene to prevent these violations.

85.   Additionally, Defendants failed to perform their mandatory duty under California Government Code § 845.6 to provide medical care to TOLOSA even though Defendants had actual knowledge that the TOLOSA was in need of urgent medical care for TOLOSA'S serious medical conditions comprising of his severe deteriorating physical health and associated symptoms, and Plaintiffs are authorized to maintain this cause of action.

86.   Accordingly, Defendants each are liable to Plaintiffs for compensatory and punitive damages under 42 U.S.C. § 1983, including survivor damages under *Chaudry v. County of San Diego* consisting of *pre*-death pain and suffering, loss of life, and loss of opportunity of life, and reasonable attorney fees under 42 U.S.C § 1988.

**SECOND CLAIM FOR RELIEF**
***STATE-CREATED DANGER*-14th AMENDMENT**

**(On behalf of the Estate of LOPE TOLOSA and Asserted Against Defendants ZARAGOZA, ARUTA, DOE 1, DOES 2-3, DOES 4-8, and DOES 9-10)**

87.   Plaintiffs repeat and re-allege each and every allegation in paragraphs 1-86 of this Complaint with the same force and effect as if fully set forth herein.

88.   At all times relevant to this Complaint, defendants NGUYEN, LUCA, KRUG, ZARAGOZA, KAUR, ARUTA and DOES 1-8 were acting under color of state law as COUNTY jail medical and correctional staff and supervisors.

89.   Under the Fourteenth Amendment, TOLOSA had a constitutional right to be free from Defendants' affirmative action of placing him in a position of actual, particularized danger. Specifically, while under the Defendants' care and authority, Defendant COUNTY, acting by and through the Adult Correctional Healthcare was operating their medical housing and detox units with a known shortage of medical staff, yet continued to book a large number of inmates who had known medical conditions including those required close monitoring for drug and alcohol detoxification. Despite the known shortage of staff, COUNTY still had an affirmative duty not to expose TOLOSA to more danger than he would have been prior to their encounter.

90.   As of May 6, 2024, Defendants COUNTY and DOES 8-10 were all aware that COUNTY jail including the Main Jail were operating with a deficient number of medical staff and yet continued to book medically ill and detoxifying inmates who needed medical care and detoxification. The short-staffed milieu created an unreasonable risk of danger to inmate health and patient care.  The staff deficiency was ongoing and defendants COUNTY had notice of such staff shortage for some time prior to the subject incident.

91.   At all times relevant to the complaint, COUNTY acting by and through its medical jail division, or the Adult Correctional Healthcare was operating its facilities including the Main Jail with the following personnel shortage as they were actively searching for the following positions: one physician, three registered

nurses, ten licensed vocational nurses, two supervising registered nurses, and two medical assistants.

92.    By failing to ensure the Main Jail housing unit was adequately staffed with medical personnel, Defendants COUNTY made an affirmative decision which placed TOLOSA in a position far worse than he was before being placed into the authority and care of the COUNTY. COUNTY's affirmative act created a foreseeable risk that TOLOSA would be in grave danger and/or suffer serious medical distress without the proper medical treatment, close monitoring or higher level of care than available at the Main Jail detox housing unit.

93.    Separately, Defendants ARUTA and ZARAGOZA were aware that TOLOSA required to be monitored and have regular CIWAs conducted at a minimum of 4 to 6 CIWAs per 24 hour period. Defendants were further aware that by failing to conduct TOLOSA's prescribed CIWAs and specifically, falsifying the charts to state they "attempted yet TOLOSA refused", without actually having done so nor having monitored him for worsening symptoms, they placed TOLOSA at a grave risk of danger to his health and safety.

94.    By failing to monitor TOLOSA and falsifying his charts, Defendants ARUTA and ZARAGOZA made an affirmative decision which placed TOLOSA in a position far worse than he was before being placed into the authority and care of the defendants. ARUTA and ZARAGOZA's affirmative act created a foreseeable risk that TOLOSA would be in grave danger and/or suffer serious medical distress without the proper medical treatment, close monitoring or higher level of care than available at the Main Jail detox housing unit.

95. Defendants ZARAGOZA and ARUTA made the intentional decision not to monitor and assess TOLOSA for his CIWA's and not to take any of his vital signs specially when he would have been showing obvious signs of medical distress including shortness of breath, rapid heartbeat, hyperventilation, fever, sweating and excruciating abdominal pain for the 6-12 hours prior to notifying the

authorities that he was going man-down. Defendants ZARAGOZA and ARUTA further made intentional decisions to falsify TOLOSA's CIWA charts to cover up their failure to perform them.  Defendants made an affirmative decision which placed TOLOSA in a position far worse than he was before being placed into the authority and care of the defendants. Defendants' affirmative act created a foreseeable risk that TOLOSA would be in grave danger and/or suffer serious medical distress without the proper medical treatment, close monitoring or higher level of care than provided at the detox housing.

96.    As a direct and legal result of Defendants' acts, TOLOSA's estate has suffered damages, including, without limitation *Pre-Death* pain and suffering, loss of life, and loss of opportunity for life.  Such damages also including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to TOLOSA's Estate for punitive damages under 42 U.S.C. § 1983 and under C.C. §3294 because the aforesaid conduct rises to clear and convincing evidence of malice, fraud and/or oppressive conduct justifying the award of punitive and exemplary damages.

### THIRD CLAIM FOR RELIEF

### *Monell*-Failure to Train (42 U.S.C. §1983)

### (Against Defendant COUNTY)

97.    Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 96 of this Complaint with the same force and effect as if fully set forth herein.

98.    Defendant COUNTY knew that inmates like TOLOSA detoxifying from substances like TOLOSA were at risk of decompensating and  suffering from an emergency n and that the Sacramento County Jail and detox housing was not equipped to care for acutely ill patients. Given the known limitations of the Sacramento County Jail medical and detox housing, it was obvious that jail medical staff would need special training in order to care adequately for medically

unstable patients and to assess whether such patients should be transferred to the hospital. It was further evident, that the medical shortage would exacerbate the lack of training deficiencies make for the perfect storm where detoxifying inmates with medical needs and faced an unreasonable risk of harm to their health and wellbeing.

99.    The Sacramento County Jail nursing staff had not been trained adequately in monitoring, documenting and assessing patients' acute medical conditions within the confines of a limited-care facility such as the Sacramento County Jail, and that this failure to train led to a substantial but fatal delay in TOLOSA's care, resulting in his death.

100.    Despite COUNTY's general jail policy requiring that medically unstable inmates be seen by a doctor and/or transferred in a timely manner to a hospital for acute emergency care, Defendant COUNTY failed to train the Sacramento County Jail doctors and nursing staff so as to recognize the urgency with which medically unstable inmates must be seen and assessed in light of the Sacramento County Jail's limited medical facilities.

101.    Defendant COUNTY had policies of relying on medical professionals without training them on how to implement proper procedures for documenting, monitoring, and assessing inmates for medical instability within the confines of the Sacramento County Jail amounting to deliberate indifference.

102.    As a result of the COUNTY's failure to adequately train and implement policies, TOLOSA was caused undeserved pain and agony all culminating in his death.

**FOURTH CLAIM FOR RELIEF**

***MONELL*- UNCONSTITUTIONAL CUSTOM, PRACTICE**

**AND POLICY (42 U.S.C. §1983)**

**(Against Defendants COUNTY)**

103.    Plaintiffs hereby repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 102 of this Complaint with the same force and effect as if fully set forth herein.

104.    On and for some time prior to May 6, 2024, (and continuing to the present date) Defendants COUNTY deprived Plaintiffs' TOLOSA of the rights and liberties secured to them by the Fourteenth Amendments to the United States Constitution, in that said defendants and their supervising and managerial employees, agents, and representatives, acting with reckless and deliberate indifference to the rights and liberties of Plaintiffs' TOLOSA and of persons in their class, situation and comparable position in particular, knowingly maintained, enforced and applied an official recognized county custom, policy, and practice of: Acting deliberately indifferent to the serious medical needs of inmates and newly booked inmates when defendants failed to take any meaningful corrective measures despite being previously placed on notice of their egregious practices resulting in prior deaths. The following is a list of *Monell* violations:

(a)  Failing to implement policies and procedures on basic symptom recognitions and assessment of inmates who are in medical distress and suffering from medical emergencies;

(b)  Routinely failing to train detention staff and medical staff on the symptoms and assessment of inmates who are in medical distress and suffering from medical emergencies.

(c)  Inadequately supervising, training, controlling, assigning, and disciplining employees including COUNTY Jail medical and correctional staff;

(d)  Inadequately staffing the medical housing unit with medical staff to adequately care for inmates who are detoxifying and/or suffering from medical distress.

(e)  Engaging in the custom and practice of discriminating against acutely ill and/or detoxifying inmates and withholding emergency medical treatment until an inmate is at a near-death condition;

(f)  Routinely preventing inmates access to medical doctors, due to a custom and practice of a failed booking policy;

(g) Routinely failing to hospitalize patients and or refer to higher level of care when need; and

(h)  Routinely failing to properly implement and manage alcohol withdrawal protocols;

105.     By reason of the aforementioned policies and practices of Defendants, Plaintiffs have suffered the loss of their father and son, TOLOSA.

106.     Defendant COUNTY, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above, these defendants condoned, tolerated, and through actions and inactions thereby ratified such policies. Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiffs and other individuals similarly situated.

107.     By perpetrating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants COUNTY, acted with an intentional, reckless, and callous disregard for the well-being of TOLOSA and her constitutional as well as human rights.

108.     Furthermore, the policies, practices, and customs implemented and maintained and still tolerated by Defendant COUNTY were affirmatively linked to and were a significantly influential force behind the TOLOSA's death.

109.      As a direct and legal result of Defendants' acts, Plaintiffs have suffered damages, including, without limitation, past pain and suffering, loss of

life, loss of opportunity for life, and compensatory damages. Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

110.     As a direct and proximate result of the defendants' aforementioned conduct, the Plaintiffs, successors-in-interest for TOLOSA, set forth that the defendants are liable to them for damages including but not limited to funeral and burial related expenses, and damages to provide for the Plaintiffs' deprivation and injury as a result of the loss of the TOLOSA's support, company, comfort, counsel, familial relations, aid, association, care and services.

## FIFTH CLAIM FOR RELIEF

## 14th AMENDMENT-INTERFERENCE WITH PARENTAL RELATIONS

### (Asserted by all Plaintiffs Against Defendants NGUYEN, LUCA, KRUG, ZARAGOZA, KAUR, ARUTA, DOE 1, DOES 2-3 and DOES 4-8)

111.     Plaintiffs hereby repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 110 of this Complaint with the same force and effect as if fully set forth herein.

112.     Plaintiff Matilde Dasalla Quiogue had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with her child Lope Edwin Tolosa.

113.     Plaintiff Kitana Tolosa had cognizable interests under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state

interference in Plaintiff's familial relationship with her father, Lope Edwin Tolosa.

114.    The aforementioned actions of Defendants and DOES 1-10, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of TOLOSA and Plaintiffs, and with purpose to harm unrelated to any legitimate law enforcement objective.

115.    As a direct and proximate result of these actions, TOLOSA experienced pain and suffering and eventually died. Defendants thus violated the substantive due process rights of Plaintiffs to be free from unwarranted interference with their familial relationship with TOLOSA.

116.    As a direct and proximate cause of the acts of Defendants, Plaintiffs suffered emotional distress, mental anguish, and pain. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of TOLOSA, and will continue to be so deprived for the remainder of their natural lives.

117.    As a result of their misconduct, Defendants and DOES 9-10, are liable for TOLOSA's injuries, either because they were integral participants in the failure to provide medical care, or because they failed to intervene to prevent these violations.

118.    Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for the rights and safety of TOLOSA and Plaintiffs and therefore warrants the imposition of exemplary and punitive damages as to the individual Defendants.

119.    Plaintiffs bring this claim both individually and seek wrongful death damages under this claim. Plaintiffs also seek punitive damages and attorneys' fees under this claim.

### SIXTH CLAIM FOR RELIEF

**Negligence per G.C. sect. 820 et seq.**

**(Against Defendants COUNTY, NGUYEN, LUCA, DOES 4-8)**

120.    Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 119 of this Complaint with the same force and effect as if fully set forth herein.

121.    Defendants NGUYEN, LUCA, COUNTY, DOES 4-8, each have a duty to operate and manage the Sacramento County Jail in a manner so as to prevent the acts and/or omissions alleged herein. Said defendants owed TOLOSA, as an inmate in defendants' custody, care and control, a duty of due care to report his medical distress and to protect his health and physical safety.

122.    Defendant COUNTY each also had a duty that the medical housing and detox facility were adequately staffed with medical personnel so as to avoid endangering the inmates who were known to suffer from substance withdrawals including alcohol withdrawals and complications thereof[7].  By knowingly accepting new inmates to the detox housing while lacking the proper number of medical staff, COUNTY breached its duty of care to ensure inmates would receive an adequate level of medical and detox care, monitoring and treatment.

123.    Defendants NGUYEN, LUCA, COUNTY, DOES 4-8, were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as jail deputies and supervisors to TOLOSA. It was foreseeable that as a result of Defendants' acts and omissions, as described above, TOLOSA'S symptoms and severe abdominal pain would worsen, resulting in his physical injury, suffering, and death. Defendants' breach proximately caused injuries and damages to TOLOSA as Plaintiffs' claim herein.

124.    As a direct and proximate result of NGUYEN, LUCA, COUNTY, DOES 4-8 aforementioned conduct, the Plaintiffs set forth that the defendants are liable to them for damages including but not limited to funeral and burial related expenses, and damages to provide for the Plaintiffs' deprivation and injury as a

result of the loss of the TOLOSA's support, comfort, counsel, familial relations, aid, association, care and services.

## SEVENTH CLAIM FOR RELIEF

**Bane Act C.C. 52.1 Et Seq. (State)**

**(By Plaintiffs Against Defendants NGUYEN, LUCA, KRUG,**

**ZARAGOZA, KAUR, ARUTA, DOE 1, DOES 2-3,**

**DOES 4-8, and DOES 9-10)**

125.    Plaintiffs hereby repeat, re-state, and incorporate each and every allegation in paragraphs1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

126.    California Civil Code, Section 52.1 (*the Bane Act),* prohibits any person from using violent acts or threatening to commit violent acts in retaliation against another person for exercising that person's constitutional rights. However, under *Reese v. Cnty of Sacramento, 888 F.3d 1030, 1042-4043 (9ᵗʰ Cir. 2018),* the Bane Act <u>does not require</u> the "threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation Alleged.

127.    Specific intent does not require a showing that a defendant knew he was acting unlawfully; reckless disregard of the right at issue is all that is necessary. [8] *Luttrell v. Hart,* 2020 WL 5642613.

128.    Here, all Defendants showed the requisite specific intent to violate TOLOSA's constitutional rights, through their reckless disregard for his constitutional rights.

---

[7] Alcohol withdrawal and intestinal Volvulus share several common symptoms such as high heartbeat, upset stomach, high blood pressure, sweating, tremor.

[8] Per *Luttrell*, if a Plaintiff adequately pleads a claim for deliberate indifference which requires a pleading of reckless disregard, then he was sufficiently alleged the "intent" element required for the Bane Act. Under *Reese*, "a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of that right. Some courts such as *Polance v. California 2022 WL 1539784, at*4 (N.D. Cal. May 16, 2022)* have deemed the application of the Bane Act appropriate when there is a showing of deliberate indifference toward correctional inmates ("observing that "defendant who acts with deliberate indifference toward an inmate may satisfy the 'threat, intimidation, or coercion' element, as the custody context makes that violation especially coercive" and collecting

129.    Defendants acted with reckless disregard in failing to closely monitor and treat TOLOSA medical conditions as described more fully above. Defendants also acted with reckless disregard by ignoring TOLOSA's noticeably worsening symptoms and failing to administer his prescribed CIWA's and failing to hospitalize him or refer him to a higher level of care prior to his man-down call.

130.    When Defendants committed the above acts, they interfered with TOLOSA's civil rights to due process, to equal protection of the laws, to medical care, to be free from acts of neglect and recklessness, to be free from deliberate indifference a serious medical condition, to be free from state actions that shock the conscience, and to life, liberty, and property.

131.    Defendants knowingly deprived TOLOSA of his constitutional rights through acts which were inherently coercive, intimidating, and threatening, by leaving him unmonitored in a detox cell, by failing to monitor and treat him medical conditions, failing to hospitalize him when appropriate, and/or refer him to a higher level of care.

132.    Defendants successfully interfered with the above civil rights of Plaintiffs.

133.    The conduct of Defendants was a substantial factor in causing Plaintiffs' harms, losses, injuries, and damages.

134.    COUNTY is vicariously liable for the wrongful acts of the deputy defendants and medical defendants and supervisors defendants pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

135.    Defendants DOES 1-10 are vicariously liable under California law and the doctrine of *respondeat superior*.

136.    The conduct of Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for TOLOSA rights, justifying an award

of exemplary and punitive damages as to the defendants and attorneys' fees under this claim.

## EIGHTH CLAIM FOR RELIEF

### Failure to Summon Medical Care per G.C. §845.6 and §844.6
### (By Plaintiffs Against Defendants NGUYEN, LUCA, KRUG,
### ZARAGOZA, KAUR, ARUTA, DOE 1, DOES 2-3,
### DOES 4-8, and DOES 9-10)

137.   Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 136 of this Complaint with the same force and effect as if fully set forth herein.

138.   California Government Code § 845.6 creates an affirmative duty for jail staff "to furnish or obtain medical care for a prisoner in his custody."  TOLOSA desperately required prompt medical attention from Defendants, Sacramento County Jail staff. Defendants had actual knowledge of TOLOSA'S need for immediate medical care and deliberately chose to not furnish TOLOSA with medical care. Defendants failed to discharge the duty imposed upon them by California Government Code § 845.6. As a direct and proximate result of Defendants' acts and/or omissions, hereinabove described, TOLOSA suffered deteriorating mental health, cardiac arrest, and severe opiate withdrawal resulting in his untimely death.

139.   Defendants are liable for their employees' breach of their duty to summon required immediate medical care while acting in the course and scope of their employment under the doctrine of *respondeat superior*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against all Defendants, and DOES 1 through 10, inclusive, as follows:

1.     For compensatory damages according to proof including wrongful death damages.

2.     For punitive damages against the individual defendants in an amount to be proven at trial;

3.     For interest;

4.     For reasonable costs of this suit and attorneys' fees per 42 U.S.C. §1988; and

5.     For *predeath* pain and suffering, loss of life and opportunity of life under Federal damages and *Chaudry v. County of San Diego*.

5.     For such further other relief as the Court may deem just, proper, and appropriate.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial.


Date: April 3, 2025             THE SEHAT LAW FIRM, PLC


By*: /s/ Cameron Sehat, Esq.*
  Cameron Sehat, Esq.
  Jeffrey Mikel, Esq.
  Attorneys for Plaintiffs,
  Kitana Tolosa and Matilde Dasalla Quiogue